09 CV 8674

JUDGE GARDEPHE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ROCHE INTERNATIONAL LTD.,

                    Plaintiff,

          - against -

CREDIT SUISSE GROUP AG,

                    Defendant.

_____ Civ. _____

**COMPLAINT**

**Jury Trial Demanded**

RECEIVED
OCT 13 2009
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Roche International Ltd. ("Roche"), by its attorneys Gibbons P.C., for its Complaint against defendant Credit Suisse Group AG ("CS Group"), alleges as follows:

**NATURE OF THE ACTION**

1.     In this action, plaintiff Roche seeks to recover the more than $270 million in losses it suffered as a result of a massive securities fraud orchestrated and conducted by the U.S. broker-dealer subsidiary of defendant CS Group, Credit Suisse Securities (USA) LLC ("Credit Suisse")[1], through the Directors of its Corporate Cash Management Group, Julian T. Tzolov and Eric S. Butler, in connection with the purchase and sale of unauthorized auction rate securities for Roche's account.

2.     As part of its unlawful scheme, Credit Suisse through Tzolov and Butler engaged in a course of conduct calculated to defraud Roche (and several other foreign corporate customers) by falsely representing that Credit Suisse would invest Roche's corporate cash exclusively in student loan securities guaranteed by the U.S. government ("student loan securities"), which Credit Suisse promoted to Roche and others as safe and highly liquid

---

[1]     Pursuant to its customer agreement with Credit Suisse, Roche also has commenced an arbitration against Credit Suisse before FINRA Dispute Resolution to recover its losses and other damages.

alternatives to cash equivalent investments such as money market funds, bank deposits and commercial paper.

3.    Relying on Credit Suisse's false and misleading representations about the nature of the securities it would purchase, and purportedly did purchase, for the Roche account and the assets collateralizing those securities, Roche authorized Credit Suisse to invest exclusively in student loan securities for the Roche account.

4.    Contrary to its representations and Roche's specific authorization and instructions, during the period from November 2006 through July 2007 Credit Suisse fraudulently invested over $545 million of Roche's cash in collateralized debt obligations ("CDOs") and other auction rate securities ("ARS") collateralized by subprime mortgages, credit linked notes and other risky collateral, rather than in federally-guaranteed student loan securities as represented.

5.    In furtherance of its fraud, Credit Suisse concealed its unauthorized purchases of risky ARS for the Roche account by making false and misleading statements to Roche about the nature of the securities Credit Suisse had purchased, and by altering documents and changing the names of purchased securities to make it appear that Credit Suisse had purchased only student loan securities as represented.  Even as late as July and early August 2007, Credit Suisse falsely represented to Roche that the securities purchased for Roche's account were all student loan securities.

6.    In August 2007, the ARS that Credit Suisse had actually purchased for the Roche account became illiquid, and were later frozen, when auctions in the ARS market for those

securities began to fail and the U.S. credit markets constricted.  Consequently, Roche has been unable to sell the unauthorized and unsuitable ARS in its account since August 2007.

7.      It was only after Roche confronted Credit Suisse about its holdings in mid-August 2007 that Credit Suisse finally admitted the ARS purchased for Roche's account were not student loan securities.  In acknowledgment of its wrongful conduct, Credit Suisse bought back two of those securities, South Coast Funding and TABS Funding, from Roche in late September 2007 for their aggregate face value of $35 million.  Credit Suisse refused, however, to buy back the other unauthorized and unsuitable ARS in the portfolio despite Roche's insistence then and thereafter that it do so.  As a result, Roche has been left with over $270 million in securities that it did not want and has been unable to sell.  Moreover, the securities have significantly declined in value since August 2007.

8.      At all relevant times, defendant CS Group controlled Credit Suisse, its wholly-owned U.S. subsidiary.  CS Group also participated in and furthered the fraud of Credit Suisse and its coverup by, among other things, willfully or recklessly (a) directing and encouraging Credit Suisse to sell unsuitable CDOs and other risky ARS to its customers as part of a corporate strategy to reduce Credit Suisse's own exposure to those securities, (b) maintaining a compensation structure for Credit Suisse brokers that facilitated and encouraged the fraud by paying them higher commissions and incentive compensation for selling unsuitable CDOs and other risky ARS, rather than student loan securities, to their customers, (c) failing to establish or operate a supervisory system and internal controls for Credit Suisse, or to ensure that Credit Suisse followed its own compliance and risk management procedures, which would have detected and prevented the fraud, (d) refusing to timely acknowledge and disclose the fraud to Roche, securities regulators and the investing public, or to take prompt corrective action, (e)

refusing to terminate and rectify the fraud by rescinding the remaining unauthorized ARS transactions and returning Roche's funds or otherwise making Roche whole for its losses, (f) claiming falsely that Roche was responsible for its losses because it relied on the misrepresentations and altered confirmations of Credit Suisse in connection with the purchase and sale of unauthorized and unsuitable ARS, and (g) claiming falsely that Roche settled, waived or otherwise compromised its rights and claims against Credit Suisse by accepting the buyback of two securities in September 2007, as alleged above.

9.    As a result of the fraudulent and other culpable conduct of Credit Suisse and defendant CS Group in connection with the purchase and sale of ARS, Roche and the other corporate victims of that unlawful conduct have suffered over $1 billion in losses. In addition, federal criminal proceedings, as well as an SEC enforcement action, were commenced against Tzolov and Butler for securities fraud and wire fraud.

10.    On July 22, 2009, Tzolov pleaded guilty to all criminal charges against him, and admitted all material facts establishing the underlying fraud on which Roche's claims against CS Group in this action are based. Similarly, on August 18, 2009, Butler was convicted of all criminal charges against him after a three-week jury trial.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 because it involves claims arising under Section 20(a) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78a et seq. (the "Exchange Act"), together with supplemental claims under state law.

4

12.     This Court has personal jurisdiction over defendant because defendant has transacted and is transacting business in the State of New York and in this judicial district.

13.     Venue is proper in the Southern District of New York pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) and (d) because relevant events, violations and omissions alleged in this Complaint occurred in this judicial district, and defendant is an alien.

## PARTIES

14.     Plaintiff Roche International Ltd. is a corporation organized under the laws of Bermuda and has its principal offices in Hamilton, Bermuda.

15.     Upon information and belief, defendant CS Group is a global banking institution based in Zurich, Switzerland with seven main offices, including one in New York, New York. CS Group is registered with the SEC as a foreign issuer, and is the parent corporation of its wholly-owned, U.S. broker-dealer subsidiary, Credit Suisse, which is headquartered in New York, New York.

## FACTUAL ALLEGATIONS

### Auction Rate Securities

16.     Auction rate securities ("ARS") are bonds and preferred stock with interest rates or dividends that are reset periodically through an auction at which potential investors submit bids indicating the lowest yield at which the investor would be willing to buy the securities. The yield on the securities is then set at the lowest rate sufficient to sell all of the securities offered at the auction. The auctions typically are held every 7, 28 or 35 days depending on the security.

17.     Holders of ARS can enter orders to sell them at an auction.  If there are not enough bids received to purchase all of the securities offered at the auction, the auction is said to have failed and the customer sell orders are not executed.  In that event, the securities are "rolled over" to the next periodic auction.

18.     As in this case, ARS often are CDOs or other asset-backed instruments collateralized by various kinds of underlying assets ranging from risky subprime mortgages, credit linked notes, mobile home contracts, and corporate bonds to safe federally-guaranteed student loans.

**Credit Suisse's Corporate Cash Management Group**

19.     During the period from at least October 2006 through August 2007, Tzolov and Butler were the Directors of the Corporate Cash Management Group at Credit Suisse (the "Cash Management Group").  They had two to four sales assistants who worked under their supervision in the Cash Management Group.

20.     As part of their responsibilities for Credit Suisse, Tzolov and Butler regularly communicated with their customers by telephone and email in connection with the purchase and sale of securities.  They also prepared and sent, or directed their sales assistants to prepare and send, emails to Credit Suisse customers, including Roche, confirming the ARS transactions executed for their accounts.  At all times, Tzolov and Butler carefully monitored and controlled the content and transmission of the email confirmations to Roche and other customers.

21.     Tzolov and Butler collaborated closely in managing the Cash Management Group and in servicing the Cash Management Group's customers.  A portion of the commissions generated in the accounts of the Cash Management Group's customers was retained by Credit

Suisse. On information and belief, the remaining commissions were shared equally by Tzolov and Butler.

22.     When Tzolov or Butler purchased ARS for a Cash Management Group customer, Credit Suisse received a commission from the dealer selling that security. The selling dealers also paid a commission to Credit Suisse when one of its customers rolled over an ARS through a periodic auction. The commissions paid for the purchase or rollover of non-student loan backed ARS were significantly higher than the commissions paid for the purchase or rollover of federally-guaranteed student loan securities.

**Roche's Cash Management Investment Requirements and Objectives**

23.     At all relevant times, Roche performed investment management services for the Roche Group and its various companies worldwide. Roche's cash management group was required to invest its corporate cash in safe, short-term and highly liquid investments. Thus, Roche's primary cash investment objectives were preservation of principal and liquidity because Roche required its invested cash to be readily available for current operating costs and other corporate purposes. Roche made its cash management investment requirements and objectives known to Credit Suisse.

**Credit Suisse's Misrepresentations About The Student Loan Securities Program**

24.     At all relevant times, Roche Group maintained a banking relationship with CS Group. On October 9, 2006, through the introduction of CS Group, Tzolov and Butler of Credit Suisse met with Roche representatives in Basel, Switzerland to present a program of investing in federally-guaranteed student loan securities. In its oral presentation and written m arketing

materials, Credit Suisse represented that the investment program consisted of "student loan issues, whose underlying loans are guaranteed by the US Department of Education."

25.     Credit Suisse also represented in its oral presentation and marketing materials that, due to the federal government guarantee of principal and accrued interest on the student loan collateral, "student loan paper has perhaps the highest quality and liquidity in the [asset-backed securities] market" and that "Student Loan issues are widely viewed by market participants as perhaps the most creditworthy and liquid [asset backed securities] investment."

26.     Similarly, Credit Suisse represented in its oral presentation and marketing materials that "[d]ue to the secure and stable collateral together with the government guarantees, which ensure principal repayment to investors, student loans practically present no credit risk to their holders."  Credit Suisse touted student loan securities as both federally-guaranteed and higher-yielding alternatives to cash equivalent investments such as money market funds, commercial paper, bank deposits and repurchase agreements.

27.     Credit Suisse also touted its "Risk Management Controls" to Roche stating that "Risk Management is an integral part of the Corporate Cash Management Platform at [Credit Suisse]" and that "[o]ur mission is to add value to our clients through integrated risk management systems that will identify and control investment process, performance and operational risks."  Among other things, Credit Suisse claimed that it had automated systems and management overview procedures in place to identify and prevent any securities purchases that violated the customer's investment instructions and policies.

28.     Relying on Credit Suisse's material representations regarding the student loan securities and its Risk Management Controls, Roche agreed to participate in the investment

program and authorized and instructed Credit Suisse to purchase only federally-guaranteed student loan securities in accordance with the program presented. At the time, Roche had had no previous investment experience with auction rate securities, including student loan securities.

29.     Credit Suisse confirmed Roche's authorization and instruction to purchase only federally-guaranteed student loan securities for the Roche account in Tzolov's October 11, 2006 email to Roche, which stated in pertinent part as follows:

> We truly appreciate you carving out the time to meet in Basel yesterday. We are excited that you find the 28-day Aaa/AAA Government Guaranteed Student Loan vehicle an attractive product to take advantage of for your short-term USD investment needs. We believe the marketplace would allow Roche to diversify the portfolio into a high quality asset class (Aaa/AAA) and enhance interest income.

30.     Although Roche did not give Credit Suisse discretionary trading authority over its account, Roche permitted and relied on Credit Suisse to select the particular student loan securities in which Roche's available cash would be invested. Generally, Roche's cash manager would notify Credit Suisse that Roche had a certain amount of cash to invest on a particular day, and then Credit Suisse would purchase ARS for Roche's account and confirm the investment to Roche that day by email.

**Credit Suisse's Unauthorized Purchases And Fraudulent Concealment**

31.     Although Credit Suisse purchased a few student loan securities for Roche's account initially, it soon began purchasing exclusively non-student loan ARS for Roche. From November 2006 through August 2007, Credit Suisse invested over $545 million in unauthorized and unsuitable CDOs and other ARS backed by risky collateral such as subprime mortgages --

knowing full well that Roche had authorized and instructed it to purchase only federally-guaranteed student loan securities.

32.     Credit Suisse knew that Roche had not authorized or instructed Credit Suisse to invest in ARS backed by any other collateral. Credit Suisse also knew that purchases of non-student loan backed ARS were inconsistent with Roche's investment requirements and objectives.

33.     In furtherance of its fraud, Credit Suisse concealed its unauthorized purchases of risky ARS by sending Roche email confirmations that falsely described, or altered the names of, the ARS purchased for Roche's account to make them appear to be student loan securities. Credit Suisse knew that the email confirmations falsely described, or altered the names of, the securities they had purchased for Roche's account. Credit Suisse's misrepresentations and omissions in this regard were material because they concerned the nature of the securities Credit Suisse purchased for Roche's account and the assets collateralizing them.

34.     For example, on November 1, 2006, as part of its first trades for Roche, Credit Suisse purchased $90 million of Camber Trust ARS for Roche's account. The Camber Trust ARS were backed by risky collateral and were not federally-guaranteed student loan securities as represented.

35.     On December 1, 2006, Tzolov sent Roche a list of Roche's current holdings that falsely described the Camber Trust investment as "Camber Funding St. Loan." On May 21, 2007, Butler sent Roche another email referring to the Camber Trust investment as "Camber Funding Student Loan." When Tzolov sent Roche the list on December 1, 2006 and Butler sent

the email on May 21, 2007, they knew that the Camber Trust investment was not a federally-guaranteed student loan security.

36.     In several other instances, Credit Suisse fraudulently concealed its unauthorized purchases of non-student loan backed ARS by sending email confirmations to Roche in which the names of securities were altered to omit the terms "CDO" and "Mortgage."  Credit Suisse engaged in this conduct to conceal from Roche the true nature of the underlying collateral for those securities.  On information and belief, Credit Suisse gave its sales assistants a blanket instruction not to use the term "CDO" in email confirmations sent to Roche and other customers, and instead to substitute the term "Funding."

37.     On July 23, 2007, Roche instructed Credit Suisse to invest $35 million in "college debt." Ignoring Roche's express instructions, Tzolov promptly purchased for Roche's account $35 million in two ARS, South Coast Funding and TABS Funding, that it knew were backed by subprime mortgages and other risky collateral and not by federally-guaranteed student loans.

38.     Later on July 23, 2007, Roche emailed Tzolov and asked if the securities Tzolov had purchased were in fact "US Government backed securit[ies]."  In his reply email to Roche that day, Tzolov stated unequivocally:  "It's the same structure as all of the other bonds we buy for you.  It's student loans packaged into trusts and the individual loans are guaranteed by the US Dept of Education . . . ."  This statement was knowingly false and misleading because Tzolov knew the securities were not federally-guaranteed student loan securities.

**Roche's Discovery Of The Fraud**

39.     In August 2007, ARS auctions began to fail for ARS that were not backed by federally-guaranteed student loans.  Although Roche did not know it at the time, the risky ARS

that Credit Suisse purchased for the Roche account had become illiquid.  As late as July and early August 2007, Tzolov and Butler continued to falsely represent to Roche that its securities were all federally-guaranteed student loan securities.

40.     In mid-August 2007, Credit Suisse first advised Roche of a failed auction for a Roche security.  When Roche asked for an explanation and for documentation confirming that Roche was invested exclusively in student loan securities, Credit Suisse finally admitted that none of the Roche holdings were student loan securities.  Credit Suisse also advised that the non-student loan backed securities were now illiquid because of the collapse of the ARS market.  Consequently, Roche has been unable to sell the unauthorized ARS in its account since August 2007.

41.     Roche demanded at the time that Credit Suisse and CS Group rescind all of the Roche trades and immediately return the money that Credit Suisse had invested in the unauthorized and unsuitable ARS for Roche's account.  Initially, Credit Suisse and CS Group refused to acknowledge that Credit Suisse's brokers and directors had done anything wrong, or that Roche was entitled to the return of its money.

42.     Finally, in late September 2007, after much discussion and in acknowledgment of their wrongful conduct, CS Group caused Credit Suisse to buy back the two non-student loan backed ARS that were the subject of the July 23, 2007 email confirmation, South Coast Funding and TABS Funding, for their aggregate face value of $35 million.  Credit Suisse and CS Group refused, however, to buy back the other unauthorized ARS in the portfolio or to return Roche's funds despite Roche's insistence then and thereafter that it do so.  As a result, Roche was left

with $270,250,000 in securities that it did not want and is now unable to sell.[2]  Moreover, the securities have significantly declined in value since August 2007.

**Tzolov And Butler Are Convicted Of All Criminal Charges Arising From Their Fraud**

43.    As a result of their fraudulent scheme and actions in connection with the purchase and sale of ARS for Roche and other customers, Tzolov and Butler were arrested and indicted in June 2008 for wire fraud and other alleged crimes.   In addition, the SEC commenced an enforcement action against them in September 2008 based on the same fraudulent scheme and actions.  Tzolov fled the jurisdiction, but was later found and apprehended in Spain and returned to the U.S. for trial.

44.    On July 22, 2009, Tzolov pleaded guilty to all criminal charges against him, and admitted the material facts establishing the underlying fraud on which Roche's claims against CS Group in this action are based.  Specifically, Tzolov made the following admissions as part of his plea statement:

> Your Honor, from in or about November 2004 through September 2007, within the Eastern District of New York, the Southern District of New York, and elsewhere, while employed as a broker with the firm Credit Suisse, I agreed with Eric Butler to execute securities transactions on behalf of certain clients, knowing that these transactions were the result of untrue statements of material facts made by Eric Butler and I which misled and were intended to mislead the clients about the nature of the securities purchased on their behalf.
>
> Specifically, Eric Butler and I told clients that we would only purchase for their accounts Auction Rate Securities backed by student loans, when, in effect, we knew that we would also buy and we did buy Auction Rate Securities that were not backed by student loans.

---

[2]    In November 2008, Roche transferred its ARS portfolio to its parent corporation, Roche Financial Management Ltd. of Bermuda.

I understand[3] that the clients would rely on these false statements. As part of the scheme and to conceal our conduct, I sent to the clients and directed others to send to the clients emails that falsified the names of the securities purchased for the clients.

Transcript of the Guilty Plea of Julian Tzolov on July 22, 2009, at 28-29.

45.     On August 18, 2009, after a three-week jury trial, Butler was convicted of all criminal charges against him, including those arising from his and Tzolov's fraudulent conduct against Roche, as alleged herein.

## CS Group Controls Credit Suisse

46.     At all relevant times, CS Group controlled Credit Suisse and its employees as confirmed by the following facts:

(a)     Credit Suisse is a wholly-owned subsidiary of CS Group, and CS Group incorporates the financial results of Credit Suisse into its own financial statements. CS Group defines Credit Suisse as a "consolidated subsidiary" and refers in SEC filings to CS Group and all of its consolidated subsidiaries jointly as "we" and "us";

(b)     CS Group provides for litigation reserves against losses from legal matters in which its subsidiaries, including Credit Suisse, are defendants;

(c)     CS Group presents itself and its subsidiaries as a single entity that operates on a worldwide basis without regard to geographic or jurisdictional boundaries;

(d)     CS Group describes its operations in cities including New York as its "[l]ocal offices," not separate companies. Similarly, CS Group lists seven "Main Offices" on its website, one of which is its headquarters in Switzerland and one of which is the New York office of Credit Suisse;

(e)     There is overlap at the highest levels of executive leadership of the two entities. For instance, Paul Calello serves both as the CEO of CS Group's investment bank, and as a Managing Director and Board Member for Credit Suisse; and Robert Shafir is both the CEO of Asset Management and Credit Suisse Americas for CS Group, and is also the CEO and a Board Member of Credit Suisse; and

---

[3]     Counsel for Tzolov later corrected the word "understand" to "understood" on the record. Tr. 29-30.

(f)     On information and belief, CS Group's CEO works primarily out of Credit Suisse's New York offices.

47.     CS Group confirmed its control over Credit Suisse in this case by conducting the discussions with Roche about the unauthorized ARS purchases and directing the eventual buyback of the South Coast Funding and TABS Funding securities in September 2007, as alleged above.

## CS Group Culpably Participated In Or Furthered The Fraud And Coverup

48.     CS Group willfully or recklessly participated in or furthered the fraud of Credit Suisse and its coverup in several ways.  First, on information and belief, CS Group implemented a corporate strategy during the relevant period of reducing its exposure to CDOs and other ARS holdings, after recognizing by late 2006 that securities connected to subprime mortgage debt and other collateral were potentially unsafe investments.  As part of this corporate strategy, CS Group directed and encouraged Credit Suisse to sell unsuitable CDOs and other risky ARS to its customers.  Thus, the fraud against Roche and other customers advanced the corporate strategy and interests of CS Group by placing unauthorized ARS in the customers' portfolios, and thereby reducing Credit Suisse's own exposure to those securities.

49.     Second, CS Group maintained a compensation structure for Credit Suisse brokers that facilitated and encouraged the fraud by paying them higher commissions and incentive compensation for selling unsuitable CDOs and other risky ARS, rather than student loan securities, to their customers.

50.     Third, CS Group failed to establish or operate a supervisory system and internal controls for Credit Suisse, or to ensure that Credit Suisse followed its own compliance and risk management procedures, which would have detected and prevented the fraud.  Further, CS

Group failed to provide effective oversight of Credit Suisse's sales practices and compliance deficiencies. On information and belief, CS Group failed to provide effective supervision and control because it knew that Credit Suisse's sales practices and compliance deficiencies contributed to CS Group's profitability and also supported its corporate strategy of reducing Credit Suisse's own exposure to CDOs and other ARS. Among other things, CS Group knew or should have known that the following practices facilitated or encouraged the fraud by Credit Suisse and its brokers:

(a)  Credit Suisse customers earned virtually the same return on student loan securities as they did on CDOs and other risky ARS but Credit Suisse generated higher fees for the firm on the latter securities. In other words, Credit Suisse captured the additional return on the riskier securities, despite the fact that the risk itself was passed on to its customers;

(b)  Credit Suisse was selling risky and unsuitable CDOs and other ARS through its Cash Management Group, whose customers typically require extremely low-risk, highly liquid investments that can be treated as cash equivalents;

(c)  The compensation of Credit Suisse brokers was linked to the revenue the brokers generated for the firm, and they therefore had an incentive to place CDOs and other risky ARS in customer accounts; and

(d)  Credit Suisse stood to make additional profit from sales of the securities on which Credit Suisse served as the collateral manager or originator.

51.  Fourth, Credit Suisse and CS Group refused to timely acknowledge and disclose the fraud to Roche, securities regulators and the investing public, or to take prompt corrective action, even when presented with incontrovertible evidence of the fraud in August 2007 and thereafter. For example, Credit Suisse made public statements that the issue affected a "limited number of clients" with whom Credit Suisse was in "active discussions." Through these and similar statements, Credit Suisse and CS Group plainly sought to cover up the nature and massive scale of the fraud.

52.    Fifth, although CS Group privately conceded in August and September 2007 that Credit Suisse had purchased unauthorized and unsuitable ARS for Roche's account, rather than student loan securities, CS Group refused to terminate and rectify the fraud by rescinding the remaining unauthorized ARS transactions and returning Roche's funds or otherwise making Roche whole for its losses. Instead, CS Group has forced Roche to bear the financial impairment resulting from the deteriorating creditworthiness and illiquidity of the securities.

53.    Sixth, CS Group falsely claimed that Roche was responsible for its losses because it relied on the misrepresentations and altered confirmations of Credit Suisse in connection with the purchase and sale of unauthorized and unsuitable ARS.

54.    Seventh, CS Group falsely claimed that Roche settled, waived or otherwise compromised its rights and claims against Credit Suisse and CS Group by accepting the buyback of two securities in September 2007, as alleged above. At all times, Roche has consistently demanded that Credit Suisse and CS Group buy back all remaining ARS and return Roche's funds.

**Both Credit Suisse And CS Group Profited From The Fraud**

55.    Both Credit Suisse and CS Group had a motive and incentive to engage or participate in the fraudulent activities against Roche because they derived substantial benefits from those activities. For example, Credit Suisse and CS Group benefited from the substantially higher commissions that Credit Suisse received for the fraudulently purchased CDOs and other unsuitable ARS for Roche, than it received for the student loan securities it was authorized and instructed to buy. On information and belief, Credit Suisse also earned origination or placement fees on a number of the fraudulent purchases of ARS for Roche.

56.     On information and belief, Credit Suisse and CS Group also profited because, as discussed above, certain securities fraudulently placed in the Roche account were transferred from Credit Suisse's proprietary holdings or money market funds, and/or would have appeared on its books if those securities had not been transferred to Roche and other victims of the fraud. Credit Suisse was thereby able to limit its own exposure (and thus CS Group's exposure) to high-risk ARS by foisting those securities on, and thereby shifting the risk to, its customers.

57.     Finally, on information and belief, by continuing to hold unauthorized and unsuitable ARS in Roche's account, Credit Suisse was able -- even to this day -- to earn higher fees than it would earn from less risky investments, such as student loan securities.

## FIRST CAUSE OF ACTION

### (Violation of Section 20(a) of the Exchange Act)

58.     Roche realleges and incorporates by reference paragraphs 1 through 57 above as if set forth fully herein.

59.     As alleged above, Credit Suisse and its brokers, through the use of instrumentalities of interstate commerce, committed intentional violations of Section 10(b) of the 1934 Exchange Act and Rule 10b-5 thereunder, by engaging in deceptive practices, making untrue statements of material fact, and misleadingly omitting material facts in connection with the purchase and sale of securities for the Roche account.

60.     CS Group is a "controlling person" of Credit Suisse and its brokers and other employees within the meaning of Section 20(a) of the Exchange Act.

61.    As alleged above, CS Group also culpably participated in the fraud and other unlawful conduct against Roche.

62.    By reason of the foregoing, CS Group has violated Section 20(a) of the Exchange Act.  CS Group is therefore liable for the damages caused to Roche by the fraud and other unlawful conduct.

63.    As a direct and proximate consequence of CS Group's wrongful conduct, Roche has suffered and continues to suffer damages.

## SECOND CAUSE OF ACTION

### (Aiding and Abetting Common Law Fraud)

64.    Roche realleges and incorporates by reference paragraphs 1 through 63 above as if set forth fully herein.

65.    CS Group participated in or aided and abetted the fraud and its coverup by (a) failing adequately to supervise Credit Suisse and its brokers and thereby detect and prevent the fraud, (b) failing to acknowledge or disclose the fraud under circumstances requiring it to do so, (c) failing to terminate and rectify the fraud by rescinding the unauthorized ARS transactions and returning Roche's funds, and (d) failing to comply with Roche's demands to return the funds it paid for the remaining ARS in the Roche account.

66.    By reason of the foregoing, CS Group aided and abetted the common law fraud of Credit Suisse and its brokers.

67.    As a direct and proximate consequence of CS Group's wrongful conduct, Roche has suffered and continues to suffer damages.

## THIRD CAUSE OF ACTION

### (Conversion)

68.    Roche realleges and incorporates by reference paragraphs 1 through 67 above as if set forth fully herein.

69.    CS Group and Credit Suisse refused to comply with Roche's demands beginning in August 2007 to rescind the unauthorized ARS transactions and return the funds that Credit Suisse had fraudulently invested for Roche's account.  By refusing to comply with Roche's demands and return the funds, CS Group has converted Roche's property in knowing violation of Roche's rights.

70.    CS Group was fully aware that it and Credit Suisse came into possession of Roche's funds as a result of the fraudulent activities and other unlawful conduct of Credit Suisse and its brokers, and yet it has refused to return the wrongfully obtained funds to Roche.

71.    By reason of the foregoing, CS Group has unlawfully exercised possession and control over property in which Roche holds a superior possessory interest.

72.    As a direct and proximate consequence of CS Group's wrongful conduct, Roche has suffered and continues to suffer damages.

## FOURTH CAUSE OF ACTION

### (Unjust Enrichment)

73.    Roche realleges and incorporates by reference paragraphs 1 through 72 above as if set forth fully herein.

74.     By reason of the foregoing, CS Group was unjustly enriched by the fraud and other wrongful conduct at the expense and to the detriment of Roche.

75.     To the extent that Credit Suisse and CS Group obtained commissions, origination fees, placement fees or other compensation or financial benefits from or in connection with purchase, sale or rollover of ARS for Roche's account, CS Group was unjustly enriched and, as a matter of equity, should be required to disgorge the full amount or value of those commissions, fees and other compensation and financial benefits, and to remit those sums to Roche.

76.     Further, to the extent that Credit Suisse and CS Group transferred ARS from their own accounts to Roche's account, or transferred ARS to Roche's account that, but for the transfer, would have reverted to Credit Suisse or CS Group, CS Group was unjustly enriched and, as a matter of equity, should be required to remit to Roche a sum equal to the amount that Roche paid for those securities.

**WHEREFORE**, plaintiff Roche respectfully requests judgment against defendant CS Group as follows:

(a)     Directing CS Group to provide Roche with relief equivalent to rescission of the unauthorized transactions by remitting to Roche the full face value of the ARS that Credit Suisse purchased for Roche's account or, alternatively, awarding Roche damages in that amount;

(b)     For the amount of the reduction in value of the ARS purchased for Roche and all other damages from the time Roche first demanded that Credit Suisse and CS Group rescind the unauthorized ARS transactions and return Roche's funds;

(c)     For disgorgement of commissions, fees and other compensation or financial benefits that Credit Suisse or CS Group received from or in connection with purchase, sale or rollover of ARS for Roche's account, and the award of all such funds to Roche;

(d)    For the costs and other damages that Roche has incurred as a result of the fraud, including but not limited to the cost of borrowing money to fund its operations and the value of opportunities foregone because of Roche's inability to access the money it invested with Credit Suisse;

(e)    For punitive damages in an amount deemed appropriate by the Court;

(f)    For prejudgment interest on the foregoing amounts;

(g)    For the costs and disbursements of this action, including attorneys' and experts' fees and expenses; and

(h)    For such other and further relief as the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: New York, New York
       October 13, 2009

GIBBONS P.C.
One Pennsylvania Plaza, 37th Floor
New York, New York 10119-3701
(212) 613-2000

By: _____
       Michael R. Griffinger
       R. Scott Garley
       Paul A. Saso

*Attorneys for Plaintiff Roche International Ltd.*